131093, Xactware Solutions v. Pictometry International. And we'll give the other side a moment to get settled. Okay, please proceed. Thank you, your honors, and good afternoon. May it please the court. This case addresses a question of public accessibility of Pictometry's 2007 user guide. And it really asks the question whether a company can engage in a nationwide sales, marketing, and distribution effort for its software program and user guide and then stand mute when the guide is cited as prior art to its patents. Here, this 2007 guide came two years before the priority date for the 880 patent, more than three years before the priority date for the 732 patent. Because Pictometry has a duty of candor and good faith before the PTAB, it cannot simultaneously raise technical evidentiary objections while concealing what it knows are the facts that undermine its objections. I know you're making general statements when we talk about this case because you're making pretty serious sounding accusations. The board found against you in this case because it said that whatever use there was of this user guide was very restricted, right? That's correct, your honor. They said it was a closed group. That was the theory that the Pictometry presented and that the board accepted. Was that wrong in your view as a matter of fact or as a matter of law? Both, your honor, because the closed group theory is repudiated by Pictometry's own document. And let me be specific about that. That's the MAPC, the Metropolitan Area Planning Council license agreement with Pictometry. And the MAPC... This is your 3.1C2 argument? Yes, yes it is, your honor. That's 3.1C2 as well as 3.1B. The provisions that Pictometry cited and that the board relied upon without citing this additional material were the ones that said keep this confidential. But the rest of the agreement makes it clear that the user guide is available to whoever needs it. That means a municipality that's a member of the MAPC to any employee of that municipality who has need to have access to... Only in the office of the holder of the license. That's what the license agreement says, your honor, but other provisions in that section say... That's what the license guidelines at Exhibit 2021 say. The contractor, John Q. Public, can come into the office of the municipality and there enjoy the user guide. Can't make a copy of it and take it home, but they can do it there. That's correct, your honor. I think that is correct. So John Q. Public has access to this user guide. But in addition, any employee of the municipality... But John Q. Public has access to it under tight restrictions. Well, I don't think the restrictions are very tight, your honor. You can't copy it and take it home, can't make notes on it. You can see it in the office. Right. So this is like doctors at a conference who see things. So we've got a body of case law that deals with restricted access. Yes. Right? Yes, but I think in this... And your problem is to show why your case is different from that case law. Yes, and I think the evidence shows, your honor, that the MAPC agreement and other documents of record show that the user guide is available to any employee of the municipality. You can make as many copies as you need, and it's also available to a contractor to the municipality. Yes, the employees, somebody who works in the municipality, at least I suppose they probably have to be authorized somehow in the municipality. I suppose the janitor, the person who cleans the toilets, doesn't have access to the software for the users who are using it. That's true. Yeah, I think that's right, your honor. But this is image acquisition. There's no showing in this record that they are persons of ordinary skill in the art. Well, your honor, I believe it's a reasonable assumption from the facts that we have. This is image acquisition software. It's a system for obtaining... Don't you have to make your case? Don't you have to show that it's at least an interested person plus one interested person who's one of skill in the art who'd have access to this? I don't believe we're required to specifically say that a person of ordinary skill in the art actually had access to it. I think we have to show that it was distributed. Is it enough that someone walking off, a teenager walking off the street has access? Does that make it publicly accessible? Well, that person may not be the right person, your honor, but a municipal employee... The who matters, doesn't it? It does matter, but here the who is a municipal employee or an employee of a contractor for the municipality. In terms of municipal employee, how do I know that you're not relying on the janitor as opposed to a software technician? Because of the nature of the software that's involved, your honor, that it's an image acquisition software system that Pictometry sells. Pictometry has one of the best aerial image libraries in the country, and this is their software that encourages you to make use of it, and the user manual tells you how to do that. We start off, there isn't free access. So first off, the John Q. public can't walk in and see this stuff, right? Well, your honor, if I might point out that we obtained and put in the record the user manual. It's in your appendix in volume two, and I think in volume five, one for each proceeding. It's several hundred pages long. We got it off the internet, so it's definitely publicly accessible. Is that the case you made? I thought this was really a question of who had restricted access and whether those restrictions were real. Are you arguing now that it was available on the internet at the time, and therefore it was publicly accessible? We believe it was based on the evidence that we presented. Is that a record in this case? I believe it is, your honor. You believe it is? Is it a record? Did you put into the record in this case, through an expert or with an affidavit or whatnot, that this is freely available on the internet? The user manual. Not that specifically, your honor. We did put the user manual into evidence. I understand that, but so you found it someplace. So the user manual itself... We're dealing with a decision the board made, not the one that you want. So what did the board say about the availability on the internet? The board adopted the argument that it was a closed group thing because there were restrictions on access. Are they talking about this availability on the internet? They were not talking about availability on the internet. They excluded certain exhibits, we think erroneously. Where does this internet availability come from? It came from oral argument just now. It's nowhere in the record. Did it come from anywhere other than oral argument? Well, the manual is in the record, your honor. We put it in the record. You started your argument by talking about candor and good faith and not concealing things. Yes. And then you're coming up with something, an oral argument that you found on the internet, so you think that shouldn't affect our judgment as to the board's decision? What am I missing? Am I getting old and missing something? No, it's probably me, your honor. You want to take back what you said about accessibility on the internet? We don't claim that we established accessibility on the internet in 2007. Why did you bring it up? Just as mentioning that that's how it got into the record. Well, that's a pretty significant thing. If there were a finding made it was available on the internet, that could change this whole case, but it's not an issue in this case. Yes, I agree with that, your honor. I'm not making that contention that we have a record of that. So don't you think in candor and good faith you should tell us now to forget the fact that you found it on the internet? Well, you can do that, your honor. You could do it or you're asking us to do it. You may do it, your honor, and I don't think it affects our position in the case. So can we go back to restricted use? Yes. I think Judge Clevenger asked you about five minutes ago what case you're talking about. We have a variety of cases regarding restricted use. And the ones that find it was restricted, if the people getting the information, who had access to the information, were under some sort of confidentiality. There's one you go to a show, but you couldn't take anything with you. You couldn't take pictures, et cetera. Why is this case different from those cases in terms of the restrictions that were placed? Your honor, we think that we would rely upon the Garrett case, which the board cited. We think they cited it for the proposition that if you distribute to a government agency and its employees, that that's not public use. Well, we can quibble about how we're reading that and what we're taking away from that. But anything on that general principle? Are there cases that we have, our court, that say there are restrictions here? We all agree there are restrictions, right? And people couldn't remove these documents. So is your argument that it was still publicly accessible because the restrictions still included a huge number of people? It definitely included a huge number of people, your honor. How many? Well, from what's in the record, the MAPC agreement applies to 101 cities and towns in eastern Massachusetts. The LARIAC agreement applies to 88 cities and 40 agencies in Los Angeles County. There's evidence that's in the record of a training session in Hartford, another one in Flint, Michigan, another one in Iowa. So we have multiple instances of dozens, nearly 200 municipalities and cities and agencies. All subject to the same restrictions? All having access. And we believe that even if those restrictions do apply, your honor, they still permit a very wide distribution among the employees of those municipalities and among the employees of the contractors for those municipalities. Did everybody have the same access to the user guide? Yes, that's exactly what it provides. The user guide is described as documentation. The documentation in section 3.1 includes the user guide, and it is provided that you can provide access to that user guide to the employees of the municipality, to employees of contractors of the municipality. And there's also evidence in the record that Pictometry itself provided the software program and the user guide to private companies. So we think that it fits right within Garrett, which had both government entities and private entities having access to the documents in question. What's the record site for the evidence that Pictometry made it available to third parties? Appendix site for that? I don't have that, your honor, but I will get that for you. And did the board deal with that argument? Well, didn't the board say that it couldn't be disseminated to anyone who didn't need access to it? And if it was permitted to be disseminated to third-party contractors, doesn't the MAC provide it can only do so under the supervision of the authorized users and only in certain limited circumstances? Isn't that both what the MAC agreement says and what the board found? Well, the board found that, your honor, but we believe that the MAC agreement, which Pictometry said is representative of its license agreements, specifically allows to make as many copies as are needed for whoever needs access to the user guide. And it's a complex license agreement, as you would expect for a software product. You can copy it, but you have to use it. Somebody wants to come in and copy it has to use it in the facility. You can't walk out with it. I don't think that that is provided, your honor. Well, have you bothered to look at Appendix 2000, Exhibit 2021? I believe I have, your honor. Is it acceptable to allow the hired contractor to install and take the stuff away with it? No. On an off-site computer? No. Okay, well, your honor. Okay, you should know what the exhibits say. Right, yes, I agree. Now, come back just for a second to your argument that Pictometry itself gave the user guide to third parties. And I asked you for a record site to that. Yes. And your colleague is over there going to find one. He's not looking in the record. Do you want to maybe bring it up on rebuttal? Yes, I can bring it up on rebuttal. Because I hope it's not, we found it on the computer type argument. No, no, it's in one of the exhibits that was admitted into the record. Okay, why don't we reserve some rebuttal time for you. Thank you. Good afternoon, your honors. May it please the court. As this panel has already noted, at the center of this afternoon's appeal is whether or not the documentation is confidential. And we know that it's confidential because Pictometry's license agreement that we've been discussing, which was before the board. Not whether it's confidential, but sufficient restricted access. Okay, your honor. I mean, if the document is confidential, but you let the world see it, then it has limited confidentiality. I'm just being picky with your choice of words. I understand your point, your honor. So let me turn it to limited access. But the license agreement itself talks in terms of confidentiality. So section 8.4 of the license agreement says that all of the material is valuable to Pictometry. That's why there's restricted access. Correct. Are there limits to restriction? I mean, what if you've got, you know, selling pornographic material or something. So you only distribute it and you say you can't allow anyone under 18 or anyone under 21 to look at this. So there are restrictions on the population, on who in the population can have access to something. But the restrictions only leave open, you know, 200 million people who are not covered by those. So is the inquiry about restriction, are there number levels? I mean, is there an area where even though there is some restriction in terms of public access or confidentiality, but the universe that's allowed to see it is so broad that we could still construe it as publicly available? We've thought about this hypothetically, your honor. When is enough, when is it just too much and too many people have access to it? So far, the court's cases haven't gone there. This court had a recent decision in Medtronics v. Berry, which was June 11, 2018. And in that case, there were hundreds of physicians that had been exposed in a limited access situation to the printed publication. And that was not found to be enough to have removed the reasonable expectation of limited access. I haven't seen a case that goes beyond that. That was hundreds of people. What does the record reflect regarding the distribution and possible accessibility of this software? So the record was not focused on this, your honor. Opposing counsel did mention a couple of instances where there are numbers provided in the record. For instance, we know that MAPC has 101 municipalities. We had thought that the record was devoid of any other information regarding MAPC, and we said so in our brief. And I will correct that at this point. In Exhibit 2010, there's an explanation. This was admitted by the board, and this appears at the record at Appendix 1699. And it explains that MAPC has 40 professional staff under the leadership of an executive director. And that's who is involved in MAPC for the 101 municipalities. Well, so do you agree the number might be relevant? And if so, why isn't the information there? Is it because they didn't ask for discovery or do it? Is it because the discovery was precluded or the information was not rejected by the board? So they didn't ask for discovery on it. It wasn't put into the record. What was put into the record are things like the MAPC information. They had shown that letterhead, which said 101 municipalities. We had thought it was limited to that. Now we have this additional information buried in the Cohasset Town Report. We know that Lariat has 88 counties, but we have no idea how many employees are involved. The only thing that ended up in the record about the dissemination beyond these restricted groups was information that we put into the record. Exactwear's expert witness, who is an expert in photogrammetry, which is the area involved here, and has been an expert in this area for decades, we asked him at his deposition, which we put into the record before the board, whether or not he had been aware of the EFS user manual before he became involved in the IPR. And his answer, which we put before the board in our briefing, was no, he had never been aware of it. We also asked him whether or not he asked any of the people that he knew. Yeah, but whether that one dude is aware of it. I mean, how much relevance do you really think that has? It has limited relevance, Your Honor. Yeah, really, really limited. I mean, the problem is, and it creates a really unusual situation for us, this is much bigger than the 100 physicians in Berry v. Medtronic. This is whole municipalities with an agreement that not only says that any employee who needs to use this software has the license to have access to it, but it says third parties doing business with any licensee can have access to it under the MAC agreement as needed. So what, you know, wow, like, so public accessibility isn't, I mean, it's one of these, if a tree falls in the woods and no one's there to hear it, did it really fall or make a sound? You know, the fact that you're telling me one guy says, oh, that's interesting. I'm a contractor and I wasn't aware of it. I never saw it. That's not the issue. The issue is whether it's accessible to the public, not whether someone did access it, but whether it's accessible. And doesn't this confidentiality or MAC agreement, gentlemen, gentlemen, gentlemen, you are completely disrupting this argument. So anyway, the point isn't whether or not someone did access it. I think the point is whether or not it was accessible. And doesn't the MAC agreement allow for really extensive accessibility? So let me address that last point first, and then I'd also like to address the points that came before it. So I was confused in the appellate briefing because I believe there's a new argument. They argue that after you take a look at 3.1C, that somehow that implicates 3.1B. So I want to walk through it, and I'm at Appendix 1667. Which one is that? I'm sorry, Your Honor, I don't even know which one. Is this the C2 argument? This is the C2 argument, Your Honor. C2 is actually on 1668, I think, isn't it? C begins on 1667 and continues to 1668. So in 3.1C... Wait a minute, I'm sorry. Sorry, Your Honor. 16... 1667 and 1668. I got it. All right. So in 3.1C, it talks about uses, and it says through authorized users only. Authorized users are defined in 3... I'm sorry, 2.3 above. That the licensee can use and operate the licensed software. This comes from the predicate at the beginning of 3.1, which says that there... Pictometry hereby grants to the licensee a limited license for the following. And then we get down to through authorized users to use and operate the licensed software, on designated servers and workstations, in the conduct of public business of the licensee or the authorized subdivisions, and to use the licensed product in the following activities and for no others. And then continuing on to Section 2, which is the point that Exactly brings up, for persons doing business with the licensee. That's the public. And it says that is the public in this case. No longer talking about employees and people that work for the municipality. Correct. Is it third-party contractors or is it the general public? It is defined as people that are involved in construction, real estate disposition, facilities management, environmental studies, etc. Clevenger Construction Company. Absolutely, Your Honor. I didn't realize you were diversified. So under the supervision of authorized users, authorized users allow the representatives of persons doing business with the licensee or the authorized subdivisions on licensee projects to use and execute the licensed software. Just the licensed software. So the definition of licensed products, which is used elsewhere, is not only the licensed software but also other licensed aspects. This is in Section 2.1. And that paragraph continues on to say in the last sentence that the licensee or the authorized subdivisions shall cause each participant to use hard copies of the licensed images. So the only things that the public are allowed to have are images and software access. Images and software? Yes, Your Honor. Where do we get the images? In the last sentence of that section. Shall cause each to agree to use hard copies? Hard copies or JPEG copies of licensed images. And licensed images are not documentation. I guess I thought, am I wrong? I thought that the documentation came with the software. It was part of the software. So the documentation. That's taken using the images. Those are pictures. Correct, Your Honor. Right. But licensed software, I thought, I thought that the user manual was embedded in the software. The user manual is provided with the software. It is in the same directory as the software. And it's not in the record. But you're telling me that the words licensed software exclude the manual? According to this license agreement, it does. Where do you see that specifically? In Section 110, license documentation means the written or electronic materials containing instructions or other information. And ExacWare agreed below. Where is the definition of licensed software that excludes the manual? The definition of licensed software is in 1.7. And it means any proprietary software provided by Pictometry. This includes but is not limited to such programs as EFS. And change analysis and program modules such as 911 or GIS. Maybe I'm wrong. My recollection from the board decision was that there was a finding that the manual was embedded in the software. I don't recall a finding that the manual was embedded in the software. There was an exhibit. I thought you had access to the software. You had access to the manual. Maybe I'm wrong. So on the same computer as the software is an electronic copy of the manual. It is in the same directory as the software. It is not clear before the critical date. It's not in the record. And we don't know. We're talking about 10 years ago, what was going on 10 years ago, whether or not there was a way to get to the manual from the software. It's just not in the record. It is in the same exact directory as the software. But we believe based on what's in the record. Your adversary is using 3.1C2 for the proposition that John Q. Public would have access to the user manual. And I don't understand how because it says that they can use and execute the licensed software. What about 3.1B, which also says under documentation, they can copy and use related documentation included in the licensed products. Absolutely, Your Honor, which is where I was going to next. And that is that the licensee has a license for the following. And it includes in 3.1B the ability to copy and to use the related documentation included in the licensed products in connection with the activities described. So this heavily slices and dices things. Pictometry wanted to allow the contractors to be able to use the images. They needed to sit there with the people from the municipality, for instance, to say, I need this particular image of the road. I need this particular image of the mountain. I need it from this angle. The idea is that the pictometry software provides multiple angles and an overhead view. And so it was important for the contractor to get the right angle. And so they would need to be at the elbow of the municipality user who was licensed. And not only were they licensed to help these third parties use the software, use and execute the licensed software, but they, the licensees, the employees of the municipality, they were allowed to copy and use the documentation. They weren't allowed to give it to other people. And that is the message of 3.1. It divides this up. Okay, so can we get back to what we were talking about a while back, which was what is the universe of people? Even if you slice and dice it, even if we agree with, okay, so we're down to employees of municipalities. Right. We've got Massachusetts, the map thing, and we know they're LA. Is it in the record how many jurisdictions were party to this stuff? It's not, Your Honor. But, I mean, it's known that Pictometry is the top image company, whether that happened before the critical date or not. If we're talking about municipal employees only that had access to this, it could be thousands, right? Thousands of people? Fairly assume one per unit, right? Wherever they have a computer that has the software on it, there's somebody who knows how to deal with it. It absolutely could be, but that's not in the record. This is ExactWare's petition. They chose what evidence they were going to put in the record, and the board can only make a decision. And this court can only make a decision based on the evidence that ExactWare chose to put in the record. The best we can say of this record, if you want to take ExactWare's side, is we know that Lyriac had 88 municipalities. So by Judge Clevenger's assumption, I should assume 88 people. And that MAP-C, and I'm struggling on what to call it too, had 101 municipalities. But we know that they only had 41 employees from the town of Cohasset, buried in the town of Cohasset. So what troubles me about the discussion we're having here is that I don't remember what, but some stuff in the board opinion really suggests that they were defining public use on one side and any restrictions on use on the other. And I guess some of us are wondering how fine that line might be if even those that have restricted use, the numbers are in the thousands or even hundred thousands. Why one would draw, even though we would all agree it's not technically public use because we've got some restrictions under 18 years old or something. So can you help us with that? I understand the struggle. We struggle with it too. I wouldn't want to presume for the court how to draw that line. The nice thing about this case is the evidence of the record, the stuff that the petitioner put in when they chose to file the IPR. If I use Judge Clevenger's assumption that there's one person per unit. Did they request discovery of this matter? They did not. They didn't request any discovery whatsoever. And the board noted that in the opinion that they didn't request discovery and said that if we wouldn't have given them discovery that they would have ordered discovery because we were the company that put forward this manual in 2007. And so just one more question. I'll stay as long as you're willing to let me talk. We've been throwing the numbers around. So based on the record evidence that was submitted, where are we in terms of numbers? What do we know on the record? We're not substantially higher than the numbers that were at issue in the Medtronic v. Berry case. We have Lariac, which had 88. We have MAPSE, which had 101. We get to something sub-200. I understand the reality, and I understand the assumptions we can make about the world, but we have a record below that was in front of the board that ExactWord chose to put in front of them, and that's what we're left with. I'm not going to stand here and say that there aren't lots more, but I have no idea how many more. I don't know the order of magnitude. The problem for me is, again, the issue is public accessibility, not public access past tense. And, you know, this presents a case where based on this agreement, the accessibility, and based on the numbers we do have, there was large, really large accessibility. I mean, even if you're talking one person, one person, the agreement allows for much more than that. So I don't know how to deal with that, because the question isn't how many people did access it. The question is how many people had access to it. Even if we assume that, just take the 110 that I put out, each one of those people who worked in the government had very severe restrictions on what they could do. Correct? Correct, Your Honor. That's correct, Your Honor. And there is a question about whether people from the outside, there's a board finding here that I find interesting. Petitioner, this is at page 25 of the record and of the appendix and of the decision. Petitioner has not shown that a member of the public would be aware that a user guide was stored in a folder on the computer or that they could locate it at all. Now that's talking about the public. I mean, if we're talking about accessibility, there are two categories here in this case. One is public and the other government employees. So it would seem to me that that fact finding, if supported by sufficient evidence, destroys the argument that the outsider is relevant at all. I would agree, Your Honor. If he comes in and he can't find the user guide.  I just wonder whether that doesn't take the public out of the case for purposes of our analysis, leaving us just with the spew of 110 government employees. Well, unless we find that that's not supported by substantial evidence in the record, then this panel is stuck with that finding. And I haven't heard anything from Exec Board to explain why that finding is incorrect. It is a fact finding. Well, there was a lot of evidence in the record about seeing images and seeing software. Correct. But the user guide is separate. That is correct, Your Honor. And the user guide is what the other side is trying to use as the viral reference. Correct. Not the software. Which is what they're limited to in IPR. They couldn't institute an IPR in something that wasn't a printed publication. Okay. Thank you. Thank you. Your Honor, to answer Judge Clevenger's question, I believe that the section, it's exactly the same section that you were just looking at, that we believe shows that members of employees of contractors in private companies could have access to the user guide. And I would note that that's in Section 3.1. Well, that's assuming software includes the user guide. If the software, if the user guide is distributed... You heard that argument. The words in C2 are licensed software. And the question is, does licensed software include the user guide? Well, in 3.1b, Your Honor, it states, to copy and use the related documentation included in the licensed products and connecting with the activities described in this Section 3.1. So we believe that the user guide, which was distributed along with the software, and my brother at the bar says it's right in the same directory, that that was available. And that's a different provision than the one in Section C, which is talking about concern about keeping the software itself confidential and the image library itself confidential. By the way, did you find something in the record to support your statement before you sat down that Pictromedy itself had given the user manual out to third-party members of the public? Only in this section, Your Honor. I could not find a separate reference from that. And that is not to members of the public, but to private companies. And that is because it says in C.2, under the supervision of authorized users, allow representatives of persons doing business with the licensee to use and execute the licensed software at the licensee's or authorized subdivision's facilities only. So that way, a contractor could actually come in and do this. That wasn't actually Pictromedy doing it. That were licensees of Pictometry, right? Yes. The tenor of the statement you made suggested to me that you had some evidence that Pictometry itself, apart from relationships with licensees, was handing out the user manual. Well, no, Your Honor. I didn't mean to suggest that. What I meant to say was that private entities would have access to it by means of the mechanism of this paragraph. And I think the distinction here that this paragraph tries to draw with not the greatest language in the world, but they want to keep their software confidential. They want to keep their image library confidential. The record misses, to me, misses a couple of key fact findings, which is these folks that work in the municipalities were persons of ordinary skill in the art. There's no finding to that effect, right? That's correct, Your Honor. That's correct. So we don't know whether the people who were working in the municipality, we don't know whether basically Pictrometry comes in and sets the software up for the municipalities or whether there's a geek who's skilled in the art who does it. Probably both. We don't know. We don't know. But it has to have been accessible to ones skilled in the art. Yes. So although there may be 110, one person in each agency, we don't know who they were. Well, the agencies we're talking about here, Your Honor, for example, one of them is the city of Boston. How many people in the city of Boston would have access to this software and to the related user guide? Probably hundreds. Well, we don't know. Probably hundreds. Well, the problem is exactly the statement you're making. You're asking a question, how many? You're saying probably. I mean, it's hard for the board to make a decision based on those kind of, you know, sort of assumptions or speculations. So you didn't – the information is obtainable. You're talking about specific information, and the board didn't have that information before it, right? It did not, Your Honor, but I think it's a reasonable set of assumptions. If you know that you're talking about all of eastern Massachusetts, if you know that you're talking about all of Los Angeles County, in addition to the other areas that were referenced in the admitted evidence, you have a very large number of agencies and governments with government employees together with their contractors. So our position is that that's a wide enough dissemination to constitute public accessibility. Okay, thank you. We thank both sides. Before you walk away, I want to say something. I'm sorry for being as sharp as I was with you. I have four small children,